## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CORINE VELASQUEZ,

      Plaintiff,

vs.                                        No. CIV 03-1403 JB/ACT

FRONTIER MEDICAL INC., and
FRONTIER MEDICAL EQUIPMENT, INC.,

      Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Frontier Medical Inc. and Frontier Medical Equipment, Inc.'s Motion for Summary Judgment, filed November 29, 2004 (Doc. 18). The Court held a hearing on this motion on February 1, 2005. The Court took the motion under advisement and did not rule at that time. The Court, after reviewing the parties' briefing and relevant caselaw, including the United States Court of Appeals for the Tenth Circuit recent decision in <u>Chavez v. New Mexico</u>, No. 02-2224 (10th Cir. Feb. 2, 2005),[1] finds that the Defendants' Frontier Medical, Inc., and Frontier Medical Equipment, Inc. ("Frontier")[2] are entitled to summary judgment on their federal claims.[3] Having dismissed all claims on which the Court has original jurisdiction, the Court

---

[1] The Tenth Circuit decided <u>Chavez v. New Mexico</u> after the parties completed their briefings on this motion and after the Court held oral argument on February 1, 2005.

[2] "Frontier" refers to both "Frontier Medical, Inc." and "Frontier Medical Equipment, Inc.," unless otherwise noted.

[3] In her Response, Velasquez states that she "cannot decipher whether [Frontier] ever made an argument for summary judgment on [Velasquez'] gender discrimination claim (Count IV) and [Velasquez] will treat the lack of an argument thereof as waived and will not address Count IV, as it is not specifically or separately addressed in [Frontier's] Motion for Summary Judgment." Response at 9. In its Motion for Summary Judgment, however, Frontier labels its first discussion

will dismiss all remaining claims -- all of which sound in state law -- without prejudice.

## FACTS[4]

The Plaintiff, Corine Velasquez, worked as an office assistant and equipment technician for Frontier Medical, Inc. ("Frontier Medical"), and Frontier Medical Equipment, Inc. (Frontier Medical Equipment"), from October 2, 2001 to October 25, 2002. See Complaint for Damages and Jury Demand ¶¶ 4, 6, at 2 (filed December 9, 2003)(hereinafter "Complaint"); Affidavit of Michael D. Holt ¶ 3, at 1 (executed November 16, 2004)(hereinafter "Holt Aff."). From October 25, 2002 to January 14, 2003, Velasquez worked as an equipment technician for Frontier Medical Equipment. See Complaint ¶¶ 4, 6, at 2 (filed December 9, 2003); Holt Aff. ¶ 3, at 1. Velasquez' supervisors at Frontier Medical and Frontier Medical Equipment were Michael D. Holt, President of Frontier Medical and Frontier Medical Equipment, and Corina Chaves-Sambrano ("Sambrano"), Vice

---

section, "THERE ARE NO FACTS TO SUBSTANTIATE [VELASQUEZ'] ALLEGATION OF SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT OR DISCRIMINATION OF ANY KIND." Motion for Summary Judgment at 15. Frontier, after discussing sexual harassment at length, states: "Finally, [Velasquez] cannot show that she was denied health insurance because of her race or gender and cannot show any other race or gender discrimination whatsoever." Id. at 21. Although Frontier does not discuss the race and gender discrimination at length, there is sufficient evidence in the record to alert Velasquez and the Court that Frontier was moving for summary judgment on the gender discrimination claim as well. Moreover, Frontier's motion seeks summary judgment on all claims -- not all claims with the exception of gender discrimination -- which should have indicated to Velasquez that the gender discrimination claim was before the Court in this motion. The Court will therefore consider gender discrimination as part of Frontier's motion for summary judgment. Under local rule 56.1: "All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted." Before granting summary judgment on this claim, however, the Court must first analyze Frontier's motion to determine if it met its burden of production demonstrating that no genuine issue of material fact exists on the gender discrimination claim. If so, summary judgment on the gender discrimination claim is appropriate.

[4] The Court will recite only the facts relevant to the federal claims.

President and Administrative Assistant for Frontier Medical.[5]  Holt Aff. ¶¶ 1-2, at 1.

### 1.        Sexual and Racial Harassment.

Velasquez alleges that various incidents by several of Frontier's employees and supervisors created a hostile work environment in violation of Title VII.  Velasquez contends that, while working at Frontier, she was placed in situations that made her feel "intimidated," "embarrassed," and "degraded."  Deposition of Corine Velasquez at 164:23 - 165:2 (hereinafter "Velasquez Depo.").[6] In support of this contention, Velasquez offers evidence of comments that two coworkers, Paula Wilkes and Coletta Zamora, made.

As part of her job, Velasquez would travel once or twice a week to meet another employee, Tony Godac.  See Complaint ¶ 21, at 5.  When Velasquez would let either Wilkes or Zamora know of her destination, Wilkes and Zamora would make comments to suggest that Velasquez and Godac were having a sexual relationship, such as: "If you come back with a ponytail, we'll know what you were doing;" "[Y]ou sure meet Tony a lot. Are you sure nothing is going on?;" and "Are you sure you are exchanging equipment and nothing else?"  Id. ¶ 21, at 5; Velasquez Depo. at 156:21 - 157:22.[7]  Although it does not appear from the record that Holt made any of these comments to

---

[5] At the time Velasquez worked for Frontier, Sambrano worked for both Frontier Medical and Frontier Medical Equipment.

[6] Frontier has a policy on sexual harassment, which states that an employee should report any conduct believed to be sexually harassing to Michael Holt or Corina Sambrano.  The policy goes on to state that "[t]here will be retaliation against any employee who reports a claim of sexual harassment."  Presumably, the policy intended to state that there would not be retaliation for reporting conduct perceived to be harassing.

[7] Velasquez does not offer evidence demonstrating when such comments began, or whether they occurred during her entire tenure at Frontier.  Instead, in her deposition, Velasquez made a general statement that such conduct was "constant."  Velasquez Depo. at 165:21-22.

Velasquez, Velasquez testified that he would make comments such as: "I don't know what's going on between you and Tony and I don't really care, just keep it out of the office."  Velasquez Depo. at 160:2-4.

Velasquez testified that Wilkes and Zamora did not say anything to any other workers about meeting Godac.  See id. at 166:4-6.  Velasquez complained to her supervisor, Corina Sambrano, about Wilkes and Zamora's comments, and Sambrano responded: "Don't let them get to you."  Id. at 189:16.  Sambrano also told Velasquez: "I know they didn't like you because you are Chicana." Id. at 189:8-9.  Velasquez also testified that Sambrano referred to Wilkes and  Zamora as "bitches." Id. at 189:18.[8]

Velasquez also alleges that Zamora showed her a photograph of "a man that had his penis hanging down to his knees and a woman hugging his leg."  Id. at 178:24-25.[9]  Velasquez contends that Zamora "thought it was going to blow [Velasquez'] mind" because they knew how Holt's jokes embarrassed her.  See id. at 178:21-23.  According to Velasquez, Wilkes and another coworker, Francis Christian, were also present when Zamora showed her this photograph.  See id. at 179:15-19. Velasquez testified that Wilkes said, "Oh, man," and started laughing.  Id. at 179:5-7.  Velasquez

The record does not indicate whether Wilkes or Zamora held supervisory positions over Velasquez or if they were only coworkers.  Although neither party discusses their positions in the office, in her deposition, Velasquez testified that Wilkes was the "Office Manager," but it is not clear from the record whether this position was of a supervisory nature.  Velasquez Depo. at 81:14-15.

[8] Neither party addressed this comment by Sambrano in its briefing; instead, the Court extracted it from Velasquez' deposition.

[9] Neither party includes this incident in their statement of undisputed material facts. Velasquez mentions the incident, however, in the analysis section of her Response.  See Response at 11.  Velasquez does not, however, discuss how the other co-workers reacted or whether Velasquez reported the incident.

stated that Christian's reaction suggested that she had maybe seen the photo before, and only stated, "Oh, god." Id. at 179:21-24. Velasquez complained about this incident to Sambrano. See id. at 179:21 - 180:13. Sambrano allegedly responded by laughing about it, see id. 180:10, and telling Velasquez that Zamora kept the photograph so she would not "be in such a bad mood," id. at 180:4-5.

In another incident to which Velasquez refers to in support of her claim of sexual discrimination, Velasquez' husband had sent her flowers at work. Id. at 162:2-5. Velasquez testified that Holt stated: "You must be doing something right for your husband to be sending you roses."[10] Id. at 162:6-7. In addition, when Godac telephoned the office, Wilkes answered the phone and commented to Godac that the flowers he had sent to Velasquez were beautiful. See id. at 162:8 - 163:2. Velasquez testified that these comments bothered her because it "continued the harassment of . . . me and [Godac]." Id. at 163:9-10.

Velasquez alleges that Holt also created a hostile environment by telling sexual jokes. According to Velasquez, Holt would "stand in the office and [tell] dirty jokes." Id. at 166:10-11. Velasquez contends that, because all of the desks were lined up next to each other in the office, she had no choice but to listen to the jokes, although frequently she would walk away. See id. at 166:11-15.

Velasquez asserted at her deposition that Holt got "a kick out of" telling such jokes because he would point out that Velasquez' face would turn red. See id. at 167:12-15.[11] He would then

_____

[10] Frontier refers to this incident generally and then cites to three pages of Velasquez' deposition. Neither party, however, specifically included Holt's comment in the statement of undisputed material facts. See Motion for Summary Judgment ¶ 27, at 5; Response ¶ 27, at 4.

[11] Neither party discussed this portion of the evidentiary record in their briefing.

laugh and continue telling the joke.  See id.  Although Velasquez does not provide the Court with evidence indicating how frequently such jokes were told, Velasquez testified that none of the conduct of which she complains occurred on a daily basis.  See id. at 181:11-14.[12]  When asked for an example of the numerous sexual jokes and sexual innuendos, Velasquez recited a joke Holt told at work about a man who, based on a friend's recommendation on how to attract more women, placed a potato in his swimsuit.  See id. 167:18- 168:12.[13]  The man, however, placed the potato in the back side of his swimsuit.  According to Velasquez, as Holt told this joke, he motioned in front of his genitals to indicate the potato's bulge.  See id.  Velasquez testified that the other women present during the joke did not appear to be embarrassed.  See id. at 168:19-22.  Although she never told Holt that any of his jokes were improper or made her embarrassed, see id. at 169:3-8; id. at 172:25 - 173:3; Holt Aff. ¶ 16, at 5, Velasquez asserts that Holt knew she was uncomfortable based on her "actions."  Velasquez Depo. at 169:8-10.  Velasquez concedes, however, that Holt never made any sexual propositions or advances.  See id. at 189:20-23; Holt Aff. ¶ 17, at 5.

Velasquez also alleges that Holt wore "real short, short skin tight shorts."  Velasquez Depo. at 342:8-9.  Velasquez testified that this made her feel uncomfortable because she sat close to him when he stood at the front counter and "he bulged through his shorts."  Id. at 342:21-24.  Velasquez conceded, however, that she did not complain to any one about Holt's alleged inappropriate attire.

---

[12] Again, neither party in its briefing listed how often such jokes were told.  Instead, Velasquez offers in her Response only that such jokes were told "repeatedly."  Response at 11.  The Court derived the statement that such conduct did not occur on a daily basis by reading through every page of Velasquez' deposition and extracting pertinent factual issues.

[13] Velasquez alleges in her brief that she was subjected to "countless sexual jokes, innuendos and comments," Response at 11, but this is the only specific joke she described in her briefing or at the oral hearing.

See id. at 342:14-16.  Velasquez also admitted that Holt's attire did not prevent her from completing her work.  See id. at 342:17-19.[14]

Another incident occurred when Velasquez answered the phone in the office and the person on the other end asked to speak to his "homosexual lover." Id. at 170:5-6.[15]  Velasquez testified that she was caught off guard, and was unsure of what to do until Christian explained that it was a doctor, Dr. Siedel, calling for Holt.  See id. at 169:20-21; id. at 170:6-7.  When Velasquez told Holt what occurred, Holt responded: "Well, haven't you heard, the girls haven't told you? That sexual harassment will not be tolerated, it will be graded[.]" Id. at 170:9-15.  Velasquez testified that she "couldn't believe what [she] was hearing out of the boss'[] mouth." Id. at 170:17-18.  Velasquez alleges that Holt laughed when she told him about Dr. Siedel's call.  See id. at 172:6-15.

Finally, Velasquez testified about a conversation with Sambrano that made her "very uncomfortable." Id. at 164:22.  One day, while at the Ruidoso office with Sambrano, see id. at 163:23-24, Sambrano allegedly told Velasquez that she lives in the mountains so that she can walk around naked in her house and that she and her daughter wear G-strings,  see id. at 164:1-12.  Velasquez claims that Sambrano's comments made her uncomfortable and that Velasquez felt this information was none of her business.  See id. at 164:13-15.

Velasquez also offers other evidence which, although in isolation appears gender-neutral, the Court should consider when evaluating the totality of the circumstances of Velasquez' work

---

[14] When asked whether Holt's attire was part of her sexual harassment, discrimination, or wrongful discharge claims, Velasquez responded, "I don't know."  Velasquez Depo. at 339:24 - 340:12.

[15] In her Response, Velasquez mentions that this was the "first time" she "observed an inappropriate sexual comment," but does not tell the Court when the comment occurred.  See Response ¶ 37, at 5.

environment at Frontier.  According to Velasquez, one day -- although the date this occurred in relation to the other incidents is unclear -- Wilkes and Zamora stopped Velasquez in the office and asked her if she stole popcorn from the back.  See id. at 303:18 - 306:10.  Velasquez contends that she asked "everyone else," and that she was the only one in the office that Wilkes and Zamora accused of stealing the popcorn.  See id. at 237:6-13.  Velasquez also mentions that Wilkes and Zamora made her feel like "an outsider," and never included her in anything.  Id. at 153:3-9. Velasquez alleges that, for Holt's birthday, Wilkes and Zamora passed a birthday card around the office for "everybody" to sign except Velasquez.  Id. at 153:10-13.[16]  Velasquez also testified that Wilkes and Zamora "were always whispering at [Zamora's] desk."  Id. at 120:17.  Although Velasquez could not hear what they were saying, Velasquez felt they were often talking about her. See id. at 120:19 - 121:6.  Velasquez also alleges that Christian told her that Velasquez was the only employee to not receive a Christmas bonus in 2001, although Velasquez admits that she received a bonus in 2002.  See id. at 322:10 - 323:19.  Finally, Velasquez also contends that one morning Holt passed by her house three times and, when he saw her standing outside, he "headed [toward the main street] as fast as he could."  Id. at 82:8-25.[17]  Velasquez alleges that Holt then followed her to work. See id. at 83:1-7.  Velasquez testified that she did not talk to Holt about this incident because she felt "intimidated," id. at 88:5-8, and instead talked to Sambrano about it, explaining that Velasquez thought it was "odd" that Holt "was passing in front of her house," id. at 88:9-23.  In response, Sambrano "didn't really say much" and "just kind of laughed about it."  Id. at 89:1-2.

---

[16] Neither party discusses this incident in their briefing; the Court extracted this fact from Velasquez' deposition testimony.

[17] Again, neither party lists this incident in their statement of undisputed material facts, or discusses its occurrence in its analysis section.

Velasquez repeatedly testified that she did not quit her job with Frontier because she loved her job.  See id. at 134:8; id. at 153:20-21; id. at 160:11-17; id. at 167:16-17; id. at 180:16-19; id. at 338:12-13.  Moreover, Velasquez never went to a counselor, a psychologist, or a psychiatrist to seek professional help as a result of the alleged conduct by Frontier's employees and supervisors. See id. at 194:25 - 195:17.

      2.    **Gender and Race Discrimination.**

Velasquez alleges that she was discriminated against "with regard[] to the terms, conditions, and privileges of employment because of her gender (female)," that Frontier "did not subject other white male employees to the same adverse treatment for conduct similar or equal to" Velasquez' adverse treatment, and that Velasquez was "subjected to adverse treatment due to her gender (female)."  Complaint ¶¶ 44-46, at 9.

Velasquez alleges that she was discriminated against by not being offered health insurance, see id.; Plaintiff's Response to Defendant's Motion for Summary Judgment ¶ 10, at 3, filed December 27, 2004 (Doc. 29), to which she claimed she was entitled for part -- if not all -- of her employment, see Velasquez Depo. at 142:24 - 143:10.  When Velasquez worked for both Frontier Medical and Frontier Medical Equipment, from October, 2001, to October, 2002, Velasquez received two checks, one from Frontier Medical and one from Frontier Medical Equipment.  See Holt Aff. ¶ 3 at 1-2; Velasquez Depo. at 90:4 - 91:3.  Velasquez contends, however, that although she worked only for Frontier Medical Equipment after October, 2002 until she was fired in January, 2003, she was required to do the same duties as she was before the change.  See Velasquez Depo. at 91:3-20.

Velasquez received health insurance through her husband's policy until he was laid off from his job in January, 2002.  See id. at 77:1-14.  According to Velasquez, she was never informed that

Frontier might provide health insurance, and did not ask whether it was available until she heard several coworkers discussing health insurance in August, 2002.  See id. at 76:19-21; 80:1-23. According to Frontier, health insurance was only available to full-time Frontier Medical employees and that no Frontier Medical Equipment employee, whether full or part-time, received health insurance.  See Holt Aff. ¶ 6, at 2.  The difference between these two companies, according to Holt, is that Frontier Medical Equipment is a smaller business and cannot afford health insurance for its employees.  See id.  Velasquez, however, contends that Linda Robinson, an Anglo female, worked part-time for Frontier Medical and received health insurance.  See Velasquez Depo. at 92:18 - 93:5. In addition, Velasquez alleges that Sambrano worked full-time for Frontier Medical Equipment and received health insurance.  See id. at 93:15 - 94:2.  In response, Holt alleges that Robson received health insurance because she was a full-time, as opposed to part-time, employee of Frontier Medical. See Holt Supp. Aff. ¶ 2(C), at 2.  Moreover, Holt contends that Sambrano received health insurance because she worked for Frontier Medical, in addition to Frontier Medical Equipment.  See id. ¶ 2(B) at 1-2.

Velasquez also alleges a disparity in pay between herself and white male employees.  See Complaint ¶ 45, at 9; Velasquez Depo. at 122:3-13.  In her deposition, however, Velasquez testifies that Godac was the only person who made more money than her who should not have.  See Velasquez Depo. at 125:4-20.   Velasquez testified that Godac was an "Equipment Tech."  Id. at 124:10-11.  Although Velasquez admitted she did not know how much Godac made and that she had never seen his paycheck, see id. at 122:18-19; id. at123:7, Godac allegedly told Velasquez that he made "[a]bout a hundred dollars more than [she did]," id. at 123:1-4.  Holt acknowledges that Godac earned more money than Velasquez, but claims this disparity was because Godac had worked at

Frontier for a longer period.  See Holt Supp. Aff. ¶ 2(D) at 2.  Velasquez agrees that Godac had been

working for Frontier longer than she had.  See Velasquez Depo at 123:14-24.  Velasquez alleges,

however, the Godac had less job duties than she did, see id. at 122:10-13, and that she should have

earned at least as much as Godac,  see id. at 124:17-21.  Holt alleges that Velasquez and Godac had

the same job duties.  See Holt Supp. Aff. ¶ 2(D) at 2.

On January 14, 2003, Holt fired Velasquez because of her "poor work performance, negative

attitude, [and] insubordination . . . ."  Holt Aff. ¶ 26, at 7.  The Notice of Disciplinary Action states

that Velasquez was terminated because of a negative attitude towards supervisors and other

employees.  See Notice of Disciplinary Action at 1 (January 14, 2003).  In the discharge notice, Holt

explained that she exhibited a negative attitude in their conversation, and that Holt and Sambrano had

repeatedly warned her about that attitude.  See id. at 2.  To support its contention, Frontier also

offers four additional Notice of Disciplinary Action forms, dated September 6, 2002, October 4,

2002, October 21, 2002, and December 24, 2002.  The September 6, 2002 form indicates Velasquez

was orally reprimanded for tardiness, negative attitude, late/incomplete work, and use of her work

cellular phone to make personal calls.  See Notice of Disciplinary Action at 1 ( dated September 6,

2002).  The October 4, 2002 notice states that she was orally reprimanded for her negative attitude.

See Notice of Disciplinary Action at 1 (dated October 4, 2002).  The October 21, 2002 notice states:

"REPRIMAND AND WARNING THAT ADDITIONAL INFRACTION WILL LEAD TO

FURTHER DISCIPLINARY ACTION WHICH MAY INCLUDE SUSPENSION OR

DISCHARGE."  Notice of Disciplinary Action at 1 (dated October 21, 2002).  This notice also states

that the reason for the disciplinary action was a negative attitude.  See id.  On the bottom of the form,

Sambrano wrote: "Negative attitude towards new Respiratory Therapist that was hired to help Corine

with workload.  I advised Corine that she would be fired if her attitude toward coworkers did not

improve."  <u>Id.</u>; Velasquez Depo. at 212:13-18; <u>id.</u> at 215:21-24.   Lastly, the Notice of Disciplinary

Action dated December 24, 2002 states that Velasquez received an oral and written reprimand for

unsatisfactory work performance and negative attitude.  <u>See</u> Notice of Disciplinary Action at 1 (dated

December 24, 2002).

Velasquez concedes that she was "written up" by Sambrano for being "rude."  <u>See</u> Velasquez

Depo. at 148:25 - 147:20; <u>id.</u> at 214:11-19.   Velasquez denies being rude and contends that

Sambrano never sought her side of the story.  <u>See id.</u> at 149:16-23.  Velasquez also alleges that

Sambrano forced her to sign that reprimand.  <u>See id.</u> at 152:14-25.  Velasquez testified that she was

never orally reprimanded,[18] <u>see id.</u> at 216:23 - 217:17, and that she never saw or received a copy of

the reprimands attached to Frontier's motion for summary judgment,[19] <u>see id.</u> at 218:14 -221:22.

Furthermore, Velasquez testified that she was "getting [her] work done to the best of [her] ability."

<u>Id.</u> at 340:21-22.

According to the "Personnel Disciplinary Action" that Velasquez provided, the first

disciplinary offense is usually an oral reprimand, which is written up on the disciplinary action form,

but a copy of the form is not given to the employee.  Personnel Disciplinary Action at 79.  The second

offense, however, "must be signed by the employee.  A copy of this report is given to the employee

---

[18]  The Court assumes that, when Velasquez testifies that she was "[n]ever" orally reprimanded, Velasquez Depo. at 217:17, she does not consider Sambrano showing her the reprimand in October and having her sign the form as receiving an oral reprimand.

[19]  When Velasquez was shown a copy of the October 21, 2002 reprimand, she testified that she was not sure if it was the same one Sambrano had shown her, but it was the same form.  <u>See</u> Velasquez Depo. at 213:3-17.  Velasquez further stated that she signed the reprimand Sambrano showed her, whereas the reprimand in the record does not contain Velasquez' signature.  <u>See id.</u>

for [her] records." Id.  Velasquez also provided a copy of a form entitled "Disciplinary Actions," which states that "verbal warnings" are documented and, along with written warnings, are made part of the employee's personnel file.  Disciplinary Actions at V-19.  This policy contains no requirement that the employee sign the reprimand forms -- either written or verbal.

On or about February 21, 2003, Velasquez filed a Charge of Discrimination against Frontier with the New Mexico Human Rights Division and the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of sex and national origin.  See Charge of Discrimination at 1 (dated February 21, 2003).[20]  In the Charge, Velasquez states that she experienced "different treatment" because of her national origin, and that she was "subjected to sexual comments, jokes, and gestures by [Holt]."  Id.  Velasquez further states that "[a]ll [of] this lead up to my termination."  Id.  Under the Statement of Discrimination, Velasquez stated: "I believe I have been discriminated against on the [b]asis of [her] National Origin (Hispanic) and Sex-Female (Sexual Harassment) in violation of Title VII of the Civil Rights Act of 1964, as amended."  Id.

## LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To avoid summary judgment, the non-moving party must contradict facts that the movant specifically avers.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

---

[20] In its Undisputed Material Facts ("UMF"), Frontier alleges that, at no time in which Velasquez worked at Frontier, did she inform Holt that she felt like she was being treated differently or being discriminated against because she is female or because she is Hispanic.  See Motion for Summary Judgment ¶ 55, at 9-10; Holt Aff. ¶ 14, at 4-5.  Velasquez did not respond to this UMF, and the Court did not find anything in the record stating otherwise.

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 323.  The moving party can meet the burden by highlighting for the court an insufficiency of evidence as to an essential element of the nonmovant's claim.  See id.  Once met, the burden shifts to the nonmoving party to present specific, admissible facts from which a rational trier of fact could find for the nonmovant.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. at 324).  The non-moving party may not rest on his pleadings, but must set forth specific facts.  See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   Under rule 56(e), only statements made with actual knowledge will support a motion for summary judgment; the court must disregard statements of mere belief.  See Tavery v. United States, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994).  "A plaintiff cannot create a triable issue of fact by making an assertion without supporting facts."  Kelley v. Goodyear Tire & Rubber Co., 220 F.3d 1174, 1177 (10th Cir. 2000).

For the purposes of summary judgment, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff[,]" the court should deny summary judgment.  MacDonald v. E. Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991)(quoting Palucki v. Sears, Robueck & Co., 879 F.2d 1568, 1570 (7th Cir. 1989)).

The court should, however, grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

-14-

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. A "genuine" factual dispute requires the non-moving party to show more than a mere "scintilla of evidence" to overcome a motion for summary judgment. Id. at 252.

The court may grant summary judgment if the non-moving party's evidence is merely colorable or is not significantly probative. See id. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

## LAW ON HOSTILE WORK ENVIRONMENT AND SEXUAL HARASSMENT

Title VII prohibits an employer from discriminating against an employee with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To establish a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998)(internal quotations omitted). See Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 537-38 (10th Cir. 1994)("[H]ostile work environment harassment arises when sexual conduct 'has the purpose or effect of unreasonably interfering with an individual's work performance

-15-

or creating an intimidating, hostile, or offensive working environment.'")(quoting Hicks v. Gates
Rubber Co., 833 F.2d 1406, 1413 (10th Cir.1987))(alteration in the original). "A discriminatory and
abusive environment must affect the employee's work environment so substantially as to make it
intolerable for her to continue . . . ." Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir.
1996)(holding that a work environment did not contain "pervasive" harassment when the plaintiff
made general allegations of frequent "sexual slurs" and the only specific incident to which the plaintiff
cited involved a coworker grabbing the plaintiff).   "The mere utterance of a statement which
'engenders offensive feelings in an employee would not affect the conditions of employment to [a]
sufficiently significant degree to violate Title VII.'"   Gross v. Burggraf Const. Co., 53 F.3d 1531,
1537 (10th Cir. 1995)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)(alteration
in the original)(internal quotation marks omitted)).

      The plaintiff must demonstrate that the work environment was objectively and subjectively
offensive, but need "not demonstrate psychological harm, nor is she required to show that her work
suffered as a result of the harassment." Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257,
1261 (10th Cir. 1998)(citing Davis v. U.S. Postal Serv., 142 F.3d at 1341). Relevant considerations
to determine if an environment is sufficiently objectively hostile include, in addition to looking at all
the circumstances: "[T]he frequency of the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775,
787-88 (1998)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))(internal quotations
omitted).  The harassment "must be sufficiently severe or pervasive to alter the conditions of [the
victim's] employment and create an abusive working environment." Meritor Savings Bank v. Vinson,

-16-

477 U.S. 57, 67 (1986)(quotation omitted)(alteration in the original).  The Tenth Circuit has noted, however, "that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."  O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999)(quotation omitted).[21]  When determining if incidents are sufficiently pervasive

> while courts have tended to count events over time to determine pervasiveness, the word 'pervasive' is not a counting measure.  The trier of fact utilizes a broader contextual analysis. It begins with the number, sequence, and timing of the conduct. The factfinder then looks at the nuances of an environment that is imposed by each instance of discriminatory behavior.

Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1415 (10th Cir. 1997).

The Tenth Circuit recently reaffirmed its holding that, in addition to demonstrating severe or pervasive harassing conduct, the plaintiff must also show that such conduct was because of her gender:

---

[21] The Court could read the Tenth Circuit's statement in O'Shea v. Yellow Technology Services, Inc., which has been repeated in Walker v. United Parcel Service of America, Inc., 76 Fed. Appx. 881, 886 (10th Cir. Sept. 11, 2003)(unpublished decision), and McCowan v. All Star Maintenance, Inc., 273 F.3d 917, 923 (10th Cir. 2001), as discouraging courts from ever granting summary judgment on sexual harassment claims.  The Tenth Circuit has, however, affirmed summary judgments since O'Shea v. Yellow Technology Services, Inc.  See Oliver v. Peter Kiewit & Sons/Guernsey Stone, 106 Fed. Appx. 672,  674-75 (10th Cir. Aug. 9, 2004)(unpublished decision)(affirming summary judgment on employee's sexual harassment claim, agreeing with the district court that "the conduct alleged . . . does not create a genuine issue of material fact about whether she was subject to severe or pervasive harassing behavior"); Kirk v. City of Tulsa, 72 Fed. Appx. 747, 751 (10th Cir. July 16, 2003)(unpublished decision)(affirming summary judgment because the plaintiff "failed to show harassment sufficiently severe or pervasive to support a hostile-environment claim under Title VII"); Prentice v. Univ. of Tulsa, 50 Fed. Appx. 895, 896 (10th Cir. Aug. 29, 2002)(unpublished decision)(agreeing with district court that the plaintiff "did not present evidence sufficient to raise genuine issues of material fact regarding sexual discrimination or a gender-based hostile work environment."); Pfahl v. Synthes (USA), 13 Fed. Appx. 832, 835 (10th Cir. July 6, 2001)(unpublished decision)(holding that district court properly granted summary judgment on the plaintiff's hostile work environment claim).

> But severity and pervasiveness are not enough. The "plaintiff must produce evidence that she was the object of harassment *because of her gender.*"   Penry [v. Fed. Home Loan Bank of Topeka], 155 F.3d at 1261 (emphasis added).  Title VII is not a code of workplace conduct, nor was it "designed to bring about a magical transformation in the social mores of American workers,"  Gross [v. Burggraf Constr. Co.], 53 F.3d at 1538.  Title VII targets discrimination.  Thus, a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment based on gender.

Chavez v. New Mexico, No. 02-2224, 2005 WL 237654, at *5 (10th Cir. 2005).  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."  Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir. 1994).  The Supreme Court for the United States, in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998) -- in holding that same-sex sexual harassment is actionable under Title VII -- explained that "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations.  'The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  Id. at 80 (quoting Harris v. Forklift Sys., Inc., 510 U.S. at 25).

In Chavez v. New Mexico, the Tenth Circuit explained the appropriate analysis in situations in which a plaintiff alleges both gender-based and gender-neutral conduct:

> This case is difficult because, although the harassment at issue was undoubtedly severe and pervasive, only some of it was gender-based.  The question then becomes whether Plaintiffs can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment. Our precedents say that they can: "Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct."  O'Shea [v. Yellow Tech. Servs., Inc.], 185 F.3d at 1097.  This is because what is important in a hostile environment claim is the *environment*, and gender-neutral harassment makes up an important part of the relevant work environment.  Conduct

that appears gender-neutral in isolation may in fact be gender-based, but may appear so only when viewed in the context of other gender-based behavior. Penry [v. Fed. Home Loan Bank of Topeka], 155 F.3d at 1262. Thus, when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, "reasonably could view all of the allegedly harassing conduct ... as the product of sex and gender hostility," then "it is for the fact finder to decide whether such an inference should be drawn." O'Shea [v. Yellow Tech. Servs., Inc.], 185 F.3d at 1102, 1097 (emphasis omitted).

Chavez v. New Mexico, 2005 WL 237654, at *5.  In O'Shea v. Yellow Technology Services, Inc., the Tenth Circuit reversed the district court's holding granting summary judgment on plaintiff's sexual harassment claims.  See O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d at 1102.  The plaintiff in O'Shea v. Yellow Technology Services, Inc. worked as program specialist and, after several years of work and being in good standing, she joined the "team" UNIX operating system programer.  Id. at 1098.  The team leader, Vicky Lynn Logan, provided positive feedback on the plaintiff's work and social skills.  See id.  Approximately a month the plaintiff after joined, however, a male coworker, Jones, joined the team as well, and the "[p]laintiff and Mr. Jones began to experience conflicts in their working relationship shortly [thereafter]."  Id.  The plaintiff "allege[d] that numerous instances of harassing conduct by Mr. Jones created a hostile work environment which prevented her from working effectively with others of the team."  Id.  Such instances included:

> Plaintiff alleges that she overheard Mr. Jones making fun of his wife and making other derogatory comments about women such as that women talk too much and are less intelligent than men.  Plaintiff also alleges that Mr. Jones told others she was incompetent and unable to do her job, that she was overemotional and hysterical, and that women in general were incompetent, stupid, and scatterbrained.  Plaintiff further claimed that, on one occasion, she heard Mr. Jones tell some coworkers about a dream he had in which he was watching a woman jumping naked on a trampoline.  Mr. Jones described to his coworkers how the woman's breasts looked.  On another occasion, Mr. Jones allegedly said, "Playboy is superior to a wife because at least with Playboy you get variety."  Plaintiff also alleges that she and Mr. Searle both overheard another coworker, who was doing an impression of Mr. Jones, state, "I just don't get it. I treat women like crap and they just keep coming back for more."  Finally, Plaintiff

-19-

alleges that Mr. Jones repeatedly told his coworkers that Plaintiff was going to file a sexual harassment lawsuit against him, which, according to Plaintiff, caused her coworkers to cut off contact with her and treat her poorly. Finally, in addition to Mr. Jones' conduct, Plaintiff testified during her deposition that Dan West and Ed Haffner, two other members of the UNIX team, "made derogatory comments about women jokingly all the time."

Id. at 1098-99 (citations omitted). The district court held that "a jury could find that a co-worker's derogatory comments about women and his statements to other coworkers that Plaintiff was planning to file a sexual harassment suit against him were based on [the p]laintiff's gender or sexual animus." Id. at 1096 (quotation omitted). The district court, however, granted summary judgment against the plaintiff, holding that the incidents were not severe or pervasive enough to constitute sexual harassment. See id.

The Tenth Circuit agreed with the district court that "Mr. Jones' derogatory comments about women and his statements to coworkers and others that Plaintiff was going to file a sexual harassment suit against him were based on gender or sexual animus." Id. at 1099. The Tenth Circuit, however, also held that the district could should have considered statements "overtly sexual [in] nature" -- referring to the Playboy comment and the trampoline dream -- although not directed at the plaintiff. Id. The Tenth Circuit then addressed the "social context" in which the statements occurred and concluded that "the obviously sex-and gender-related conduct engaged in by Mr. Jones, Mr. West, and Mr. Haffner created or contributed to a work environment that was charged with gender bias and sexual animus." Id.

Next, the Tenth Circuit addressed the plaintiff's allegation "that the general work atmosphere was hostile towards women and that Mr. Jones' conduct caused other employees to ostracize her and otherwise impede her efforts to perform her work." In support of this allegation, the plaintiff alleged

numerous incidents, including that (i) male programmers would never invite her out to lunch; (ii) male programmers would stop discussing a technical subject when she approached; (iii) some male coworkers became less communicative or totally ignored her; (iv) her male supervisor told her that he was not considering hiring a female programmer because "she would [not] fit into the corporate culture"; and (v) she was not given a password which was required for her to perform her job. Id. at 1099-1100 (alteration in the original). When the plaintiff complained about these difficulties, "nearly all of these complaints were met with indifference, if not resistance." Id. at 1100. Furthermore, when Jones announced that the plaintiff was planning on filing a sexual harassment suit, two team members ceased virtually all contact with the plaintiff. See id. When efforts at a meeting were made to halt this behavior, "the team members generally because uncooperative with her, which affected her work and personal life." Id. The plaintiff also offered evidence that, when discussing these problems with a male supervisor, he, in a raised voice, accused her of "being uncooperative and uncommunicative," and that in a later meeting, he exclaimed that she was the problem. Id. at 1100-01.

After considering this evidence, the Tenth Circuit held:

[T]he record fairly supports the inference that Mr. Jones' numerous derogatory comments about women and his statements that Plaintiff was going to file a sexual harassment complaint against him, along with Mr. West's and Mr. Haffner's derogatory comments about women, caused or contributed to a hostile work environment which was based on Plaintiff's gender or sexual animus. More specifically, it is reasonable to infer that this conduct caused other employees who worked with Plaintiff to ignore her, withhold information and passwords from her, refuse to discuss technical matters with her, and generally become uncooperative with her. In particular, a jury could find that the following events would not have occurred but for Plaintiff's gender: Mr. Jones' alleged failure to communicate adequately with Plaintiff regarding work matters and his statements to coworkers and others that Plaintiff was incompetent; Plaintiff's claims that her male coworkers rarely or never invited her to lunch and that they ignored her or stopped discussing technical matters

-21-

when she approached; her allegation that her coworkers and supervisors refused to give her the password she needed to do her work; her allegations that Mr. Keller and Mr. Corwin yelled at her in a demeaning and unprofessional manner on several occasions; and Mr. Corwin's alleged statement telling Plaintiff to take a vacation and get a tan.  Additionally, while they present closer questions, a jury might reasonably infer that gender or sexual animus was the source of Defendant's decision to send Mr. Jones rather than Plaintiff to a programming class and of Mr. Keller's statement that Defendant would not hire a specific female candidate because she would not fit into the corporate culture.  Moreover, many of Plaintiff's factual allegations are corroborated by the deposition and written declaration of Ms. Logan.  At the very least, the non-sexually explicit or non-gender motivated conduct which occurred after Mr. Jones began working on the UNIX team is relevant to the evaluation of Plaintiff's hostile work environment claim.  See Penry [v. Fed. Home Loan Bank of Topeka], 155 F.3d at 1263 ("Even where the motive behind the alleged conduct was not the plaintiff's gender, the court may still consider that conduct relevant when evaluating whether ambiguous conduct was in fact gender-motivated or whether gender-motivated conduct was so severe and pervasive as to create Title VII liability.").  We therefore conclude that Plaintiff has presented genuine issues of fact as to whether "she was the object of harassment because of her gender."  Penry [v. Fed. Home Loan Bank of Topeka], 155 F.3d at 1261.

[T]he obviously sex and gender-motivated conduct--including Mr. Jones' comparison of his wife to a Playboy magazine, his description of his dream, his remarks that Plaintiff was going to file a sexual harassment suit against him, and Mr. Jones' and others' derogatory comments about women--so poisoned the entire body of conduct toward Plaintiff that a jury reasonably could view all of the allegedly harassing conduct occurring after Mr. Jones began working for Defendant as the product of sex and gender hostility.  That is particularly so when the conduct is viewed against the evidence that until the onset of the sex and gender harassment Plaintiff was viewed as a good employee who got along well with others.  While there is some evidence to the contrary, including some pre-Jones harassment, the district court may not resolve disputed questions of fact at the summary judgment stage; these questions are for the jury to resolve.  See Concrete Works of Colo., Inc. v. City and County of Denver, 36 F.3d 1513, 1518 (10th Cir.1994); Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir.1992).

Plaintiff has also established genuine issues of material fact regarding the severity and pervasiveness of the conduct. Viewed in a light most favorable to Plaintiff, the record shows that once Mr. Jones started working on the UNIX team the allegedly harassing conduct began to permeate Plaintiff's work environment.  Throughout the remaining five months of Plaintiff's employment, Mr. Jones continued his demeaning conduct unabated.  He allegedly made frequent derogatory comments about women, he told people that Plaintiff was incompetent, he refused to cooperate and share work

information with Plaintiff, and he made at least two overtly sexual comments so that Plaintiff could hear them.  Further, Mr. Jones allegedly repeatedly told his coworkers that Plaintiff was going to file a sexual harassment complaint against him. Based on this evidence, we think that a jury reasonably could conclude that, as a result of Mr. Jones' and others' conduct, Plaintiff was subjected to an environment "permeated with 'discriminatory intimidation, ridicule, and insult.'" Davis[v. U.S. Postal Serv.], 142 F.3d at 1341 (citation omitted).  We therefore hold that Plaintiff established genuine issues of material fact regarding whether the alleged conduct was "'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Id. (citation omitted).

O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d at 1101-02.

In Penry v. Federal Home Loan Bank of Topeka, two female employees, Gillum and Penry, alleged that a male coworker with supervisory authority, Waggoner, created a hostile work environment with "a variety of inappropriate comments and behavior" over a three-year period. These incidents included:

Gillum asserts that several times when she and Waggoner traveled together for FHLB business, he intentionally gave hotel clerks the impression that he and Gillum were to share a room, leaving it to Gillum to correct the situation.  While Penry was on business travel with Waggoner in March 1990, he asked her if women have wet dreams.  While Waggoner and Gillum were on a business trip together in April 1990, Waggoner took Gillum to dine at Hooters, a restaurant whose marketing theme is based on its well-endowed female waiting staff.  Gillum was unaware of this feature of the restaurant until after they arrived.  Later, Penry and Gillum learned from another woman in their department that Waggoner had also chosen that restaurant while on business travel with her.  On another trip, Waggoner insisted that Gillum work in his hotel room despite her protests and request to work in her own room.

During a business trip in October of 1990, Waggoner told Penry that her bra strap was showing but then said, according to Penry, that he kind of liked it that way.  In March of 1991, Gillum overheard Waggoner make a double entendre to another male employee that one of the female assistants "allowed him to get in her drawers anytime."  In November 1992, Waggoner asked Penry what she was wearing under her dress and laughed when she said she did not appreciate the comment. On separate occasions in 1990 and 1991, Waggoner pointed out to each of the plaintiffs that the roof of a particular mall was shaped like a woman's breasts.  Penry alleges that in the fall of 1992, Waggoner began following her constantly when she got up to go to the breakroom or the bathroom. Gillum alleges that between spring of 1991 and spring

-23-

1992, Waggoner would often (at least twice a week) stand and stare at her while she was working.  In December 1992, Waggoner called one of the other female review assistants over to where he and Penry and Gillum were gathered by demanding, "bring your buns over here."  Gillum alleges that on one day in 1993, Waggoner leaned against her and repeatedly tried to look down her blouse.  Waggoner repeatedly referred to the collateral assistants as "gals" rather than by name when introducing them to employees at other banks on travel, despite their requests that he stop doing so. Both plaintiffs allege that Waggoner needlessly touched them on many occasions throughout the years they worked with him.  Each complains that he would often sneak up from behind and grab her shoulders while loudly saying her name to startle her.

Id. at 1260-61.  The district court concluded the following gender-based incidents occurred with Gillum: one gender-based comments (the drawers comment) and four incidents of unwanted physical touching and other periodic touching.  See id. at 1261.  The district concluded that Waggoner subjected Penry to four gender-based comments (the drawers comment, the bra strap comment, asking if women have wet dreams, asking what the employee was wearing under her dress), and no sexually offensive touching.  See id. at 1261-62.

The Tenth Circuit affirmed the district court decision to grant summary judgment in favor of the employer, although it disagreed with the district court's analysis.  See id. at 1260, 1262.  The Tenth Circuit explained that this Circuit's "precedents . . . eschew . . . a mechanical approach to analyzing hostile environment claims."  Id. at 1262.  The Tenth Circuit emphasized the importance of "examin[ing] the totality of the circumstances, including the context in which the alleged incidents occurred."  Id. (quotation omitted).  In addition, the Tenth Circuit directed lower courts to consider incidents with "gender-related implications," even if "the motive behind the alleged conduct was not the plaintiff's gender, . . . when evaluating whether ambiguous conduct was in fact gender-motivated or whether gender-motivated conduct was so severe or pervasive as to create Title VII liability."  Id. at 1263.  The Tenth Circuit concluded that the district court should have considered the comment

-24-

about the mall looking like a woman's breast and Waggoner taking women to dine Hooters during

business trips.

> Even taking into account these additional gender-based incidents, the Tenth Circuit was
>
> unable to conclude that a rational jury could find that plaintiffs' workplace was permeated with discriminatory intimidation. We have no doubt that the plaintiffs worked in an unpleasant environment. Nevertheless, the gender-based incidents were too few and far between to be considered 'sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive working environment.' The gender-based incidents were spread out over a period of more than three years and are insufficient to establish a discriminatorily hostile environment.

Id. at 1263 (quoting Ray v. Tandem Computers, Inc., 63 F.3d 429, 434 (5th Cir. 1995)).  The Tenth

Circuit also noted that the majority of conduct "seems motivated by poor taste and a lack of

professionalism rather than by the plaintiffs' gender.  What made the plaintiffs' environment hostile,

if anything, was not the gender-based incidents but instead the gender-neutral antics perpetrated by

Waggoner . . . ."  Id.  Because the plaintiffs did not show that the hostile environment was created

because of their gender, the Tenth Circuit affirmed summary judgment.  See id.[22]

## LAW ON DISCRIMINATION

1.     **McDonnell Douglas Analysis.**

The plaintiff bears the burden of proving discrimination.  She may do so by direct evidence,

or by indirect proof under the analytical framework that the Supreme Court set forth in McDonnell

---

[22] The Tenth Circuit decided Penry v. Fed. Home Loan Bank of Topeka in 1998.  The Court gave consideration, however, whether the Tenth Circuit, after Chavez v. New Mexico and O'Shea v. Yellow Tech. Servs., Inc., has moved away from its decision in Penry.  The Court has determined that such a conclusion would not be sound.  Even in its most recent decisions, the Tenth Circuit has consistently cited, without criticism, the Penry decision.  See, e.g., Chavez v. State of New Mexico, 2005 WL 300303, at *4-5; Chavez v. Thomas & Betts Corp., Nos. 03-2265, 03-2274 & 03-2304, 2005 WL 139155, at *3-4 (10th Cir. Jan. 24, 2005); Riske v. King Soopers, 366 F.3d 1085, 1091-92 (10th Cir. 2004).

Douglas Corp. v. Green, 411 U.S. 792 (1973).  See id. at 802-04; Morgan v. Hilti Inc., 108 F.3d

1319, 1323 (10th Cir. 1997).  Where the plaintiff is proceeding under McDonnell Douglas Corp. v.

Green, the plaintiff must first set forth a prima facie case of discrimination.  See Tex. Dept. of Cmty.

Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); English v. Colo. Dep't of Corr., 248 F.3d 1002,

1008 (10th Cir. 2001)("[A] plaintiff relying on *McDonnell Douglas* bears an initial burden of

establishing a prima facie case intended to eliminate the most common nondiscriminatory reasons that

might account for the adverse employment action.").

       If the plaintiff establishes a prima facie case, the burden shifts to the defendant to come

forward with a legitimate nondiscriminatory reason for its employment-related decision.  See

McDonnell Douglas Corp. v. Green, 411 U.S. at 802.  Upon the employer's articulation of legitimate,

nondiscriminatory reasons, the presumption of discrimination established by the prima facie case

"simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

To withstand summary judgment, a plaintiff must "present[] evidence that the defendant's proferred

reason for the employment decision was pretextual-i.e. unworthy of belief."  Kendrick v. Penske

Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)(quotation omitted).[23]  "Pretext can be

shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proferred legitimate reasons for its action that a reasonable factfinder could rationally find

them unworthy of credence and hence infer that the employer did not act for the asserted non-

_____

       [23] The plaintiff does not -- at the summary judgment stage of the proceedings -- need to show
that the actual or real reason for the unlawful action was discriminatory or retaliatory; instead, the
plaintiff need only establish that  the defendant's proferred reasons are false or unworthy of belief.
If the case progresses to a trial on the merits, however, "the sequential analytical model adopted from
McDonnell Douglas . . . drops out and [the court is] left with the single overarching issue whether
[the] plaintiff adduced sufficient evidence to warrant a jury's determination [of unlawful
discrimination]."  Fallis v. Kerr-McGee Corp., 944 F.2d 743, 744 (10th Cir. 1991)(citation omitted).

discriminatory reasons.'" Morgan v. Hilti, Inc., 108 F.3d at 1323 (quoting Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)). "To avoid summary judgment, a party must produce *specific* facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed. Thus, plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988)(internal citations and quotations omitted)(alteration in the original).

### 2. **Disparate Treatment.**

"A claim of disparate treatment encompasses a situation where the employer simply treats some people less favorably than others because of their race, color, religion or national origin. To establish a prima facie case of . . . discrimination . . . [the plaintiff] must demonstrate (1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, and (3) similarly situated employees were treated differently." Mitchell v. City and County of Denver, 112 Fed. Appx. 662, 670 (10th Cir. Oct. 12, 2004)(unpublished decision)(internal quotation and citation omitted)(citing Trujillo v. Univ. of Colo. Health Scis. Ctr., 157 F.3d 1211, 1215 (10th Cir.1998)).

"[A] prima facie case of sex-based pay discrimination [is established] by showing that she occupies a job similar to that of higher paid males. The burden is on the plaintiff to show she is similarly situated to the employee with whom she is comparing herself." Block v. Kwal-Howells, Inc., 92 Fed. Appx. 657, 660 (10th Cir. Feb. 17, 2004)(unpublished decision)(internal quotation and citation omitted).

### 3. **Unlawful Discharge.**

To establish a prima facie case of discriminatory discharge, the plaintiff must show that: "(1)

[s]he belongs to a protected class; (2) [s]he was qualified for the job; (3) despite [her] qualifications, [s]he was discharged; and (4) the job was not eliminated after [her] discharge." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1229 (citing Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999).

Although the plaintiff need not establish that, as part of a discriminatory discharge prima facie case, "the defendant hired someone outside of the protected class," Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1226,[24] "a plaintiff may . . . show pretext on a theory of disparate treatment by providing evidence that [s]he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness.  An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline." Id. at 1232 (internal quotation and citation omitted).  The Tenth Circuit further explained:

> Not every difference in treatment, of course, will establish a discriminatory intent.
>
> Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal.  It prohibits only intentional discrimination *based upon* an employee's protected class characteristics.  Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations. . . .
>
> What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.
>
> [EEOC v.] Flasher, 986 F.2d [1312,] 1319 [(10th Cir. 1992)].  Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will

---

[24] "[A] plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial prima facie burden under *McDonnell Douglas*."  English v. Colo. Dep't of Corr., 248 F.3d at 1008.

-28-

not sustain a claim of pretext.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1232.

## ANALYSIS[25]

Velasquez has not offered evidence to create genuine issues of material fact that she was subject to a hostile work environment or that she was discriminated against on the basis of her gender or her race.[26]  Thus, the Court will grant Frontier summary judgment on all federal claims and will dismiss all state claims without prejudice.

## I.      PLAINTIFF DOES NOT SHOW A GENUINE ISSUE OF MATERIAL FACT THAT SHE WAS SUBJECT TO SEXUAL HARASSMENT.

Velasquez has not established that a genuine issue of material fact exists whether Frontier's employees and supervisors sexually harassed her by subjecting her to a hostile work environment. Velasquez has not offered sufficient evidence establishing a genuine issue of material fact the alleged conduct was the "product of sex and gender hostility."  Even assuming, however, that the alleged

---

[25] In its Motion for Summary Judgment and at oral argument on the motion, Frontier highlighted the numerous responses by Velasquez in her deposition indicating that she did not know whether she was discriminated against or harassed because she is Hispanic or because she is female. See Velasquez Depo. at 111:25 - 112:2; id. at 113:5-7; id. at 113:23 - 114:6; id. at 119:19-24; id. at 121:7-9; id. at 123:8-13; id. at 166:16 - 167:10; id. at 194:21-24; id. at 339:24 - 340:12; id. at 341:17-23; id. at 378:10-22.  The Court does not consider such answers conclusive in its determination, but her answers indicate that she was unable, with competent evidence, to show a genuine issue of material fact as to many of Frontier's statements of undisputed facts.

[26] The Court will not consider whether Velasquez was subject to retaliatory discharge in violation of Title VII because such a claim was not included in her EEOC Charge of Discrimination, and is not indicated as a basis of discrimination in the Notice of Charge of Discrimination (dated February 21, 2003).  Velasquez admits that the Charge does not reflect retaliation, see Response ¶ 49, at 6, and that her Complaint does not alleged retaliatory discharge under Title VII, see id. ¶ 53, at 7.  While Velasquez' counsel in their briefing, see Response at 13, and at the hearing on this motion, see Transcript of Hearing at 32:8-19, made an oral request to amend her Complaint to include a common law retaliation claim, the Court need not address the request or the merits of such a claim because the Court is dismissing all claims based on state law without prejudice.

conduct established a genuine issue of material fact that it was the "product of sex and gender hostility," Frontier is nevertheless entitled to summary judgment because there is no genuine issue of material fact that the alleged conduct was severe or pervasive. Accordingly, the Court will grant Frontier summary judgment on Count I of Velasquez' Complaint.

**A.   FRONTIER IS ENTITLED TO SUMMARY JUDGMENT BECAUSE VELASQUEZ HAS NOT OFFERED EVIDENCE TO CREATE A GENUINE ISSUE OF MATERIAL FACT THAT SUCH CONDUCT OCCURRED BECAUSE OF HER GENDER.**

The Court must first establish whether there is a genuine issue of material fact that the various alleged incidents "were based on gender or sexual animus." At the summary judgment stage in other contexts, the plaintiff need not show discriminatory intent. In O'Shea v. Yellow Technology Services, Inc. and other cases, however, the Tenth Circuit indicates that to survive summary judgment on a sexual harassment, the plaintiff must show the incidents occurred because she is a woman.

Before embarking on the analysis of the facts at issue in this case, the Court notes that the facts at issue in Chavez presented a much clearer determination whether particular incidents were gender-based. The incidents at issue were either conceded to be gender-based, see Chavez v. New Mexico, 2005 WL 237654, at *5, or involved blatantly sexual conduct, such as a male coworker sitting in a "intimidating, forcefully seductive manner," purposefully rubbing his body against one of the female plaintiffs, calling one of the women a "fucking bitch," looking at the a female plaintiff in a "lewd and lascivious manner," and massaging his genitals, id. The facts in this case do not present the same overtly sexually charged incidents. Moreover, even though the facts in this case are more similar to the facts of O'Shea v. Yellow Technology Services, Inc. in that neither case involves sexual propositions or unwanted sexually offensive touching, the facts of this case are distinguishable based

on the context in which the alleged incidents occurred, as well as the sufficiency of the record which Velasquez provides. The Court, therefore, in establishing whether the plaintiff has offered sufficient evidence to establish that the alleged incidents constitute harassment because of her gender, finds it instructive to compare the facts of this case to those of O'Shea v. Yellow Technology Services, Inc.

The environment described in O'Shea v. Yellow Technology Services, Inc. paints a picture of a successful employee who, until placed on a team with a male coworker, excelled at her job. The record reveals a progression from a work environment which, although not void of any incidents, became intolerable based on the comments and actions of a few male coworkers. The facts in O'Shea v. Yellow Technology Services, Inc. also suggested that many of the neutral incidents occurred because of the plaintiff's gender.

When the Tenth Circuit concluded that the plaintiff in O'Shea v. Yellow Technology Services, Inc. raised a genuine issue of material fact that the harassing conduct occurred because of her gender, they examined a multitude of facts. First, the Tenth Circuit addressed the male coworkers' "numerous derogatory comments about women and [Jones's] statements that Plaintiff was going to file a sexual harassment complaint against him," as well as other male coworkers derogatory comments, as "obviously sex and gender-motivated." Such comments included the Playboy comment about a wife and describing a dream about a naked woman. In contrast, in this case, Velasquez has offered no specific evidence of any male coworker referring to women in a derogatory manner or telling any joke that degraded women. To the contrary, the only specific joke that Velasquez offered in support of her allegation that Holt constantly made sexual jokes is that of a man placing a potato

in his swimsuit.[27]  Because the joke, however, referred to male genitalia and involved Holt making gestures near his genitalia, the Court will assume that such a joke was gender-based.  The only other specific evidence of Holt's alleged harassing conduct was his comment when Velasquez' husband sent her flowers, stating "You must be doing something right for your husband to be sending you roses." Again, the Court will assume that such a comment is gender-based.  Although Velasquez makes sweeping allegations that Holt was constantly telling sexual jokes and making sexual innuendos, Velasquez provides no other specific evidence of such incidents.[28]  Without particular incidents or facts, the Court cannot determine whether such alleged incidents contributed to an atmosphere replete with sexual animus.

Same-sex harassment, however, is also actionable under Title VII.  Accordingly, the Court will also consider the incidents involving Velasquez' female coworkers and supervisor.  The Court will assume that Wilkes' and Zamora's comments to Velasquez when she would meet Tony were based on her gender, in part because Velasquez testified that she was the only one subjected to such comments, which presumably included other male coworkers.  Another incident which could be considered gender-based is Zamora showing Velasquez the photograph of the exaggerated penis. Finally, Wilkes' comment to Tony about the roses is gender-based.  Finally, Velasquez testified that Sambrano referred to Wilkes and  Zamora as "bitches."  Id.

The Court will also consider two incidents which, although not necessarily motivated by

---

[27] The Court notes that, although Velasquez alleges that Holt frequently used profane language, the record does not indicate such language contained gender-overtones, and there is no evidence of comments like in O'Shea v. Yellow Technology Services, Inc., in which Jones referred to women as stupid and scatterbrained.

[28] The Court also notes that Velasquez testified that Holt never "came on" to her sexually.

Velasquez' gender, nevertheless contained gender implications.  See O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d at 1099; Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d at 1263.  These incidents are  Sambrano's statement to Velasquez that she likes to walk around the house naked and wears a G-String, and Dr. Seidel's telephone call to the office requested to speak to his "homosexual lover."        In this case, while there may be some dispute whether a specific incident is gender based, the Court will consider the following incidents gender-based:

1.     Wilkes, Zamora, and Holt made comments insinuating Velasquez was having a sexual relationship with Godac when she would leave to meet Godac and when her husband sent her flowers.

2.     Sambrano referred to Wilkes and Zamora as "bitches."

3.     Zamora showed Velasquez a photo of a man with an exaggerated penis.

4.     Holt told a joke about a man putting a potato in his swimsuit.

5.     Holt wore short, skin-tight shorts to the office.

6.     Dr. Siedel called and asked to speak to his "homosexual lover."

7.     Sambrano told Velasquez that she likes to walk around her house naked and that she and her daughters wear G-strings.

The Court also takes into consideration the following non-gender based incidents occurred:

1.     Velasquez was the only worker in the office that Wilkes and Zamora accused of stealing popcorn.

2.     Wilkes and Zamora treated her as an outsider by asking everyone in the office to sign a birthday card except for Velasquez and by whispering to each other.

3.     Velasquez was the only worker to not receive a Christmas bonus in 2001.

4.     Holt passed by her house three times one morning, and then followed her to work.

The Court also considers the social context in which these events occurred.  In particular, the

-33-

Court notes that, at least in regard to Holt's potato joke, other women in the workplace did not appear to be embarrassed by Holt's conduct. In addition, in regard to Wilkes' and Zamora's treatment of Velasquez, there is no evidence that their treatment of Velasquez was because she is a woman. See Chavez v. Thomas & Betts Corp., 2005 WL 139155, at *3 ("Same-sex harassment arising from a hostile work environment is actionable under Title VII if the plaintiff can 'prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination *because of sex*.'")(citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). To demonstrate that Wilkes' and Zamora's treatment occurred because of her gender, Velasquez may offer evidence that such treatment was based on a general hostility toward women in the workplace or contributed to an abusive environment based on sexual-animus. Velasquez has offered no such evidence. To the contrary, Wilkes' and Zamora's actions demonstrate at most a dislike of Velasquez and an inappropriate, non-professional interaction with Velasquez about Tony, but there is no evidence that they were abusive or hostile to women in the workplace in general.[29] Moreover, at her deposition, Velasquez responded to several questions addressing the relationship between Velasquez and Wilkes, and Velasquez and Zamora. When asked whether Wilkes liked her, Velasquez testified: "I thought so . . . Sometimes she was distant. I don't know why." Velasquez Depo. at 119:1-5. Velasquez also testified that she liked Wilkes. See id. at 119:9-10. When asked about Zamora, Velasquez testified: "I could work with [Zamora]. She wasn't my best friend in the office, but yes, I didn't have hard feelings toward her." Id. at 119:12-14. When

---

[29] The Court notes that, in her deposition, Velasquez testified that Sambrano left the Ruidoso field office because she did not get along with Zamora and offered other evidence suggesting animosity between Sambrano and Wilkes and Zamora. See Velasquez Depo. at 189:11-19. There is not, however, evidence that any conflict between Sambrano, Wilkes, and Zamora was based on Sambrano's gender, or that Wilkes and Zamora treated all women in the workplace disparagingly.

asked if Zamora liked Velasquez, she testified that she did not "think so . . . [b]ecause she was very rude to me." Id. at 119:15-18.  The Court finds it improbable that if Wilkes' and Zamora's comments, when viewed in conjunction with the other alleged incidents, created such an abusive and intolerable environment, Velasquez' feelings about Wilkes and Zamora would not be stronger.  In the context in which the comments are presented in the record, therefore, they are equivalent to teasing -- as opposed sexually harassing -- comments.  In addition, Velasquez testified that she loved her job, which, although no conclusive, adds support to a finding against an environment in which she was harassed because she is a woman.

Unlike O'Shea v. Yellow Technology Services, Inc., the record before this Court is not as complete.[30]  From the chronology that the briefing and the record provide, it is not possible to determine how one incident related to another.  Without a cohesive description of how these alleged events unfolded, the Court cannot make a reasonable inference that the incidents of which Velasquez complains were sufficiently severe or pervasive to meet the standards the Tenth Circuit has set forth for sexual harassment.  In O'Shea v. Yellow Technology Services, Inc., the plaintiff presented the Tenth Circuit with a scenario involving both gender-based and gender-neutral conduct, with a factual background describing how such events unfolded.  In this case, however, Velasquez has not presented the Court with a record reflecting how and when such alleged events occurred.  Without

---

[30] The Tenth Circuit recently addressed the situation where a brief "does not point [the court] to record evidence that would allow [the court] to give proper or meaningful consideration to these claims.  'Without specific reference, [the court] will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'" Chavez v. New Mexico, 2005 WL 237654, at *11.  In an effort to portray Velasquez' case in the most favorably light as possible, however, the Court did scour the record for any other incidents that would add credence to her sexual harassment claim.  Even after extracting all possible incidents, the Court cannot conclude that Velasquez raised a genuine issue of material fact whether she was subject to a hostile work environment.

such detail, the Court cannot reasonably infer that the alleged gender-neutral events occurred because of Velasquez' gender and contributed to an overall hostile work environment.  Once Frontier bore its initial "burden of establishing the absence of any genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. at 323, the burden shifted to Velasquez to present specific, admissible facts -- independent from her pleadings -- from which a rational trier of fact could find for the nonmovant, see Adler v. Wal-Mart Stores, Inc., 144 F.3d at 671; Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d at 1241.  In this case, by not offering specific evidence supporting her allegation that the alleged conduct occurred because she is a woman, Velasquez has not met her burden under the standard for summary judgment.

Nevertheless, even upon consideration of the record as a whole and all possible inferences that can reasonably be drawn from it, Velasquez has not shown that she was subject to these alleged incidents because she is a woman.  When the Court considers all of the gender-based conduct, it does not conclude that it "so poisoned the entire body of conduct toward [Velasquez] that a jury reasonably could view *all* of the allegedly harassing conduct . . . as the product of sex and gender hostility."  O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d at 1102.  Moreover, when considering all evidence put before the Court -- both gender-based and gender-neutral -- the Court concludes that Velasquez has not offered evidence establishing a genuine issue of material fact whether "she was the object of harassment because of her gender."  Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d at 1261.  As the Supreme Court has cautioned, statements that are merely tinged with sexual connotations are not enough, Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. at 80; the statements must be made because of the plaintiff's gender.  In so holding, the Court concludes that -- "when viewing the evidence in the context" -- no reasonable jury "'could view all of the allegedly

harassing conduct . . . as the product of sex and gender hostility[.]'" Chavez v. New Mexico, 2005
WL 237654, at *5 (quoting O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d at 1102 (emphasis
omitted)).  Accordingly, Frontier is entitled to summary judgment in its favor.

### B. VELASQUEZ HAS NOT OFFERED SUFFICIENT EVIDENCE TO ESTABLISH A GENUINE ISSUE OF MATERIAL FACT THAT THE ALLEGED INCIDENTS WERE SEVERE.

Even assuming Velasquez sufficiently demonstrated that the conduct was because of her
gender, Frontier is nevertheless entitled to summary judgment because Velasquez has not offered
sufficient evidence to show a genuine issue of material fact that the conduct was severe enough to
create a hostile work environment.  For severity, the alleged hostile work environment must be judged
on an objective and a subjective standard.  Velasquez testifies that she felt degraded, embarrassed,
and humiliated as a result of her coworkers' and supervisors' conduct.  Assuming this meets the
subjective standard of establishing a hostile work environment claim, Frontier is nevertheless entitled
to summary judgment because Velasquez has not offered sufficient evidence to establish a genuine
issue of material fact whether the environment was objectively hostile.

The incidents that Velasquez alleges created a hostile work environment are not sufficiently
severe "to alter the conditions of the victim's employment and create an abusive working
environment."  Davis v. U.S. Postal Serv., 142 F.3d at 1341 (quotation omitted).  To the contrary,
the incidents alleged by Velasquez are more similar to other cases in which the Tenth Circuit has
affirmed summary judgment on the plaintiff's sexual harassment claim.  See Oliver v. Peter Kiewit
& Sons/Guernsey Stone, 106 Fed. Appx. at 674-75 (holding that male co-workers and supervisors
use of "offensive language" and making "graphic jokes" did not subject the plaintiff "to severe or
pervasive harassing behavior"); Kirk v. City of Tulsa, 72 Fed. Appx. at 751 (affirming summary

judgment because, even though the plaintiff alleged eight incidents, two of which contained "sexually offensive remarks about women, of which one was directed at [the p]laintiff, although made in her absence," and even though the male co-worker's "behavior is reprehensible, the correction of indiscriminate boorishness and vulgarity in the workplace is not the function of a Title VII action for a sexually hostile environment"); Prentice v. Univ. of Tulsa, 50 Fed. Appx. at 896 (agreeing with district court that the plaintiff's allegation of four incidents -- which included her supervisor's statement that the plaintiff needed to "sleep" with a department director to get additional staff and her supervisor's threat to harm her and her family after she told him of her intent to file a grievance -- "did not present evidence sufficient to raise genuine issues of material fact regarding sexual discrimination or a gender-based hostile work environment."); Pfahl v. Synthes (USA), 13 Fed. Appx. at 835 (holding that "[t]he totality of th[e] conduct" alleged -- that (1) some coworkers "spoke of her in derogatory, gender-based terms; (2) [another coworker] hugged her and rubbed her shoulders; (3) a bottle labeled 'holy water for she-devils' was left on her desk; and (4) 'Reeses Pieces' candy wrappers were left on her desk" -- "does not add up to an abusive working environment").

The Court, having reviewed the Tenth Circuit's case law addressing sexual harassment in the workplace, therefore concludes that the conduct alleged by Velasquez is not as severe as the cases in which the Tenth Circuit has found a triable issue of sexual harassment and more similar to the cases in which the Tenth Circuit has affirmed summary judgments for the employer or reversed the district court for no granting judgment for the employer.[31]

---

[31] For example, in Penry v. Federal Home Loan Bank of Topeka, the alleged conduct -- which included offensive sexual touching, inquiries about what the female coworker was wearing under her dress, comments containing sexual innuendos, and a remark about one of the woman's bra straps -- was more severe that the alleged conduct at issue in this case.  155 F.3d at 1260-61.

**C.     THERE IS INSUFFICIENT EVIDENCE IN THE RECORD TO ESTABLISH A GENUINE ISSUE OF MATERIAL FACT THAT THE ALLEGED INCIDENTS WERE SUFFICIENTLY PERVASIVE TO CREATE A HOSTILE WORK ENVIRONMENT.**

The Court also finds that the alleged incidents are not sufficiently pervasive. See Walker v. United Parcel Serv. of Am., Inc., 76 Fed. Appx. at 887 ("[A]n actionable hostile work environment requires objectionable conduct that is severe *or* pervasive; the test is disjunctive, and either element provides an independent ground for finding a hostile work environment.")(quotation and citation omitted).

Velasquez' supervisor's and co-workers subjected her to seven gender-based and four-neutral incidents over a fifteen-month period.[32]  Although Velasquez testified that Holt's, Wilkes', and Zamora's comments were frequent, the frequency of the comments is not, in and of itself, sufficient to establish a hostile work environment.  As the Supreme Court has noted, the hostility standards "are sufficiently demanding to ensure that Title VII does not become a general civility code.  Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  Faragher v. City of Boca Raton, 524 U.S. at 788 (quotation and citations omitted).  Instead, the incidents must be so pervasive as to create a hostile work environment, an allegation which fails based on the facts presented.

_____

[32]  In her EEOC Charge of Discrimination, Velasquez alleges that, "on or around August 2002, [she] started to experience different treatment because of [her] National Origin."  Later on in the paragraph, Velasquez alleges that she was "subjected to sexual comments, jokes, and gestures by [Holt]."  It is not clear from the Charge, or from the record, whether the alleged incidents of sexual harassment began in August, 2002, or whether they occurred throughout Velasquez' fifteen month tenure with Frontier.  Although it might strengthen Velasquez' position to establish that the comments occurred over a shorter period of time, thus making them more pervasive, Velasquez has not provided to the Court a sufficient record from which it can make such a determination.

-39-

Rather than just counting the number of incidents to evaluate whether the alleged conduct was pervasive, the Court must also consider "a broader contextual analysis."  Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d at 1415.[33]  Although Velasquez worked at Frontier for approximately fifteen months and testified that Wilkes' and Zamora's comments about Tony were "constant," the context in which the comments occurred does not support a finding that the conduct at issue was pervasive.  Moreover, when considering the alleged conduct as a whole in the broader context of the work environment,  it is not sufficiently pervasive to support a finding of a hostile work environment. See Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1366 (10th Cir. 1997)(holding that, although the five alleged incidents "appear[ed] . . . unpleasant and boorish . . . , but [the plaintiff] was not, in fact, subjected to such offensive comments or conduct as to create a 'hostile or abusive' work environment" and that "the conduct occurred sporadically over an extended period of some 16 months," and concluding that "these remarks were not sufficiently severe or pervasive as to alter the condition of [the plaintiff's] employment and create an actionable hostile work environment")(quoting Harris v. Forklift Sys., Inc., 510 U.S. at 22).

_____

[33] In Walker v. United Parcel Service of America, Inc., the Tenth Circuit held that summary judgment in favor of the employer on the employee's sexual harassment claim was not proper because the plaintiff presented sufficient evidence "to survive summary judgment on the issue of pervasiveness."  76 Fed. Appx. at 887.  In Walker v. United Parcel Service of America, Inc., the plaintiff, a female, while working as a full-time package driver for the United Parcel Service of America ("UPS"), endured numerous gender-based comments.  The Tenth Circuit counted that eight of the thirteen alleged incidents occurred in an eighth month period, and -- "when viewed in the context of the work environment at UPS" -- concluded that "[u]nder the circumstances, we believe that a rational jury could find that the alleged harassment was sufficiently pervasive to create an objectively hostile work environment."  Id. (emphasis added).  Although the Court of Appeals did not provide extensive detail on work environment at UPS, Frontier's environment -- which, for example, was composed of many, if not mostly, women -- does not dictate the same result here. Moreover, in Walker v. United Parcel Service of America, Inc., the Tenth Circuit recognized that it was a "close case for summary judgment," and, in this case, the facts are less severe and pervasive than in Walker, indicating summary judgment is appropriate.  Id. at 886.

Frontier met its initial burden of production under Celotex Corp. v. Catrett and rule 56 of the Federal Rules of Civil Procedure.  The burden then shifted to Velasquez to demonstrate that a genuine issue of material fact exists on pervasiveness.  Velasquez must provide a sufficient record from which the Court can determine whether a reasonable jury could find that the alleged conduct was sufficiently pervasive to create a hostile work environment.  Velasquez' allegations that the comments and jokes were frequent or constant does not provide the Court -- or a rational factfinder -- sufficient information from which it can find there is a genuine issue of material fact on pervasiveness.  It is not the Court's or jury's role to speculate what other jokes or comments could have been made to determine whether Velasquez' coworkers' conduct was sufficiently pervasive.  Velasquez must set forth specific facts establishing a genuine issue of material fact that the conduct was sufficient pervasive to create a hostile work environment.  See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d at 1241. Having not provided specific facts with the dates and frequency of conduct, Velasquez does not meet her burden of proof under Celotex Corp. v. Catrett and rule 56.

Accordingly, based on the evidentiary record before the Court, this case seems to be closer in its facts to Penry v. Federal Home Loan of Topeka than to O'Shea v. Yellow Technology Services, Inc. and certainly to Chavez v. New Mexico.  The work environment at Frontier "seems motivated by poor taste and a lack of professionalism rather than by the plaintiff['s] gender. . . . 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.'"  Penry v. Fed. Home Loan Bank of

Topeka, 155 F.3d at 1263 (quotation omitted).[34]  Although it is undisputed that Velasquez found

certain aspects of Frontier's work environment to be unpleasant,[35] the evidence before the Court does

not establish that such incidents occurred because of Velasquez' gender, and that the alleged incidents

were sufficiently severe or pervasive to establish a genuine issue of material fact whether Velasquez'

was sexually harassed in violation of Title VII.[36]  Accordingly, Frontier is entitled to summary

judgment on Velasquez' sexual harassment claim.

## II.     FRONTIER IS ENTITLED TO SUMMARY JUDGMENT TO THE EXTENT THAT VELASQUEZ ALLEGES HARASSMENT ON THE BASIS OF HER RACE.

It is not clear whether Velasquez also alleges racial harassment in her Complaint.  Even if such

a cause of action were pled, Frontier is entitled to summary judgment, because Velasquez has not

---

[34] Velasquez alleges that, when she told Sambrano about Wilkes' and Zamora's treatment, Sambrano did not attempt to rectify the situation.  Moreover, Velasquez alleges that Holt stated, after Dr. Seidel asked to speak to his homosexual lover, that sexual harassment is not tolerated, it is graded.  In reaching its conclusion that Velasquez has not established a genuine issue of material fact that she was sexually harassed, the Court does not condone this conduct by Velasquez' supervisors. The Court has considered how Velasquez' supervisors treated her complaints; however, Velasquez' evidence is not sufficient to establish a sexual harassment claim on the basis of a hostile work environment.

[35] Again, the Court notes that Velasquez testified that she loved her job.

[36] The Court notes that the only evidence Velasquez offers to support the alleged incidents is her deposition.  Velasquez did not submit any affidavits or other materials on which the Court can rely in reaching its determination whether there was a severe or pervasive hostile work environment based on Velasquez' gender.  While the Court does not suggest that, to establish a hostile work environment, a plaintiff must submit evidence beyond her own deposition, see Kirk v. City of Tulsa, No. 02-5138, 2003 WL 21662097, at **3 (10th Cir. July 16, 2003)(unpublished decision)("The testimony and averments of a party, however, are legally competent to oppose summary judgment, notwithstanding their inherently self-serving nature, provided they are 'based on personal knowledge and set forth facts that would be admissible in evidence.'")(quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)), the fact that she relied only on her deposition, and did not know the answer to many questions at her deposition, contributed to the Court's conclusion that Velasquez' proffered evidence did not create a genuine issue of material fact whether she was sexually harassed.

offered sufficient evidence to establish a genuine issue of material fact that she was harassed based on her race.  The only incident identified in the record that arguably could support this claim is when Velasquez complained about Wilkes' and Zamora's treatment, and Sambrano allegedly told Velasquez that they probably do not like her because she is Chicana.  Although it is unclear how this could constitute harassing conduct because it was a comment made by Sambrano speculating about Wilkes' and Zamora's intent, nevertheless, it is insufficient to support an allegation of racial harassment.  See Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)(holding that a "plaintiff must show more than a few isolated incidents of racial enmity" and that, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments")(quotation omitted).  Even assuming that referring to Velasquez as being teased because she is Chicana constitutes a racial slur, it does not constitute the "steady barrage" of comments necessary to establish a genuine issue of material fact on Velasquez' racial harassment allegation.  Frontier is therefore entitled to summary judgment on Velasquez' racial harassment claim.

## III.   VELASQUEZ DID NOT ESTABLISH UNLAWFUL DISCRIMINATION ON THE BASIS OF HER SEX OR RACE.

Velasquez does not offer any direct evidence of discrimination; accordingly, the McDonnell-Douglas burden shifting analysis applies.  To defeat Frontier's motion for summary judgment, Velasquez must first establish a prima facie case of discrimination.  If met, Frontier must then offer a legitimate, nondiscriminatory reason.  The burden then shifts back to Velasquez to demonstrate that the proffered legitimate non-discriminatory reason is pretext.

Because Velasquez has failed her meet her burden establishing discrimination on the basis of

gender or race in violation of Title VII, the Court will dismiss Count IV of Velasquez' Complaint.[37]

### A.    DISPARATE TREATMENT.

To establish discrimination on the basis of disparate treatment, Velasquez must first establish a prima facie case, which includes: (i) she is a member of a protected class; (ii) she suffered an adverse employment action; and (iii) similarly situated employees were treated differently.  See Trujillo v. Univ. of Colo. Health Scis. Ctr., 157 F.3d at 1215.  For disparate treatment on the basis of health insurance benefits as well as on the basis of pay, Velasquez satisfies the first prong of the prima facie case because she is a woman and she is Hispanic.  Moreover, for the purpose of the analysis, the Court will assume that the denial of health insurance benefits and lower pay constitutes adverse employment actions.  Nevertheless, Velasquez fails to meet her burden under the McDonnell Douglas framework.  Accordingly, the Court will grant Frontier summary judgment on Velasquez' gender and race discrimination claims, in so far as they sound in disparate treatment.

### 1.    Health Insurance.

In her prima facie case, Velasquez must establish that Frontier treated her differently than similarly situated employees who are in a nonprotected class.  Specifically, Velasquez must offer

---

[37] In her Response, Velasquez states that she "intended the counts for sexual harassment and discrimination based on national origin to be two separate counts and [that she] will request leave from this Court to file an Amended Complaint to reflect this intent.  Since the Amended Complaint is not yet filed, and [Frontier] has muddled the argument by combining the claims together, [Velasquez] has responded accordingly."  Response at 12.  As discussed in footnote 3, Frontier's motion sufficiently addressed the race and discrimination claims to trigger Velasquez' responsibility to respond to such claims and to demonstrate that a genuine issue of material fact exists on those issues.  Neither party, however, addressed the disparate treatment or wrongful discharge analysis in their briefing.  Because Velasquez insists that the discrimination claim is part of her case, because Frontier insists that is moving on all of Velasquez' claims, and to be as fair as possible to Velasquez, the Court will apply the evidence in the record to the disparate impact and wrongful discharge analyses and determine whether a genuine issue of a material fact exists on either disparate treatment or unlawful discharge on the basis of gender or on the basis of race.

evidence that Frontier treated other employees, who are either non-Hispanic or male, differently than she was treated.  Because Velasquez offers no evidence of similarly situated male employees who receive health insurance, Frontier is entitled to summary judgment on Velasquez' claim of disparate treatment on the basis of gender based on health insurance benefits.

To the extent that Velasquez alleges disparate treatment on the basis of race, Velasquez alleges that Corina Sambrano was a full-time Frontier Medical Equipment employee that received health insurance benefits.  See Velasquez Depo. at 93:14-17.[38]  Assuming that Velasquez offers this evidence to support a finding of disparate treatment on the basis of race,[39] Velasquez testified that Sambrano is Hispanic.  See Velasquez Depo. at 110:2-4.  Because Velasquez carries the burden of establishing that the was similarly situated to a person of a nonprotected class, see Block v. Kwal-Howells, Inc., 92 Fed. Appx. at 660, Velasquez' evidence of Sambrano -- who is also a Hispanic female -- receiving health insurance does not give rise to an inference of discrimination.

The only other evidence is Velasquez' contention that Melinda Robson, an Anglo, receives health insurance.  According to Velasquez, Robson only works part-time for Frontier Medical.  Assuming that this evidence establishes a prima facie case of disparate treatment on the basis of race, the burden shifts to Frontier to offer a legitimate, nondiscriminatory reason for the difference in health insurance benefits.

_____

[38] Velasquez also concedes, however, the Sambrano worked for both Frontier Medical and Frontier Medical Equipment.  See Velasquez Depo. at 93:23-25.  Although this distinction supports Frontier's legitimate, nondiscriminatory reason for providing Sambrano with health insurance, the Court need not address this issue further because -- like Velasquez --  Sambrano is Hispanic.  See id. 110:2-4.

[39] Velasquez' comparison to Sambrano would not support a claim of disparate treatment on the basis of gender because they are both female.

Frontier offered evidence that Velasquez initially worked for both Frontier Medical Equipment and Frontier Medical, but, because Frontier Medical Equipment was getting busier and after Velasquez had an argument with a coworker, Velasquez was transferred to Frontier Medical Equipment as a full-time employee.  Frontier presented evidence that Frontier Medical Equipment is a smaller company with fewer employees than Frontier Medical.  Although there is no written policy on health insurance, it has been the practice that only full-time Frontier Medical employees receive health insurance and that no Frontier Medical Equipment employee, whether full time or part time, receives health insurance.  According to Frontier, because Frontier Medical Equipment is a smaller company, it cannot afford to provide health insurance to its employees.  Thus, because Velasquez was a full-time employee for Frontier Medical Equipment, she was not entitled to health insurance.  Frontier also explained that the reason Robson received health insurance is that she was a full-time, not part-time as Velasquez alleged, Frontier Medical employee.

Having offered a legitimate, non-discriminatory reason for not providing Velasquez health insurance, the burden shifts back to Velasquez to offer evidence demonstrating that the proffered reason is pretext.  Velasquez does not offer evidence contradicting Frontier's reason for not providing Velasquez, a Frontier Medical Equipment employee, health insurance.  There is no evidence that Frontier Medical Equipment's non-minority employees receive health insurance.

The only other evidence that Velasquez offers to suggest pretext involves Velasquez' transfer around October, 2002, from working for both Frontier Medical and Frontier Medical Equipment to working only for Frontier Medical Equipment.  According to Velasquez, she received checks from both companies from October, 2001, to October, 2002, but, although she only received a check from Frontier Medical Equipment thereafter, she was still performing work for Frontier Medical, such as

-46-

data entry.  According to Velasquez, by continuing to perform some functions for Frontier Medical, she was entitled to health insurance.

This allegation, however, is insufficient to show Frontier's reason is pretext.  Although Velasquez continued to do some work for Frontier Medical, Frontier's preferred reason is that only full-time employees are entitled to health insurance.  Although still doing some tasks for Frontier Medical, Velasquez was not a full-time employee of Frontier Medical; a company can still have its employees doing work for another company, but that does not make the employees of the first company employees of the second company.  Velasquez' evidence does not contradict Frontier's legitimate, nondiscriminatory reason.  Moreover, that Velasquez was transferred to working solely for Frontier Medical Equipment within a few months of first requesting health insurance is insufficient, in and of itself, to establish Frontier's reason is unworthy of belief.

### 2.  __Pay.__

In establish a prima facie case of disparate impact on the basis of difference in pay, Velasquez must offer evidence "that she occupies a job similar to that of higher paid males.  The burden is on the plaintiff to show that she is similarly situated to the employee with whom she is comparing herself."  Block v. Kwal-Howells, Inc., 92 Fed. Appx. at 660 (quotation and citation omitted).  In Block v. Kwal-Howells, Inc., the Tenth Circuit affirmed summary judgment in favor of the employer on the plaintiff's "sex-based pay discrimination claim" because she did not meet her initial burden of establishing that "she occupied a substantially similar position . . . to the employee with whom she is comparing herself."  Id. at 659-660.  In reaching this conclusion, the Tenth Circuit concluded they had "very different backgrounds and brought different levels of experience and knowledge to their positions."  Id. at 660.  The Tenth Circuit also noted that they worked for "different departments,

-47-

with different supervisors and independent budgets," and that "the positions entailed different types of work."  Id.  The Tenth Circuit also addressed the plaintiff's attempt to establish similarly situated by asserting the same position title and similar job responsibilities.  The Tenth Circuit instructed that this argument "only go[es] so far when the actual job functions are considered.  Similar titles alone do not satisfy the requirement of similarity between jobs."  Id.

Under Block v. Kwal-Howells, Inc., Velasquez has not met her initial burden of establishing that she was similarly situated to Godac.  The evidence offered by Velasquez to support her claim of disparate pay is her deposition testimony that an Anglo male coworker, Godac, had the same position title, an "Equipment Tech," but was paid more than she was.  Velasquez testified that Godac told her that he did not have a degree, but does not offer evidence indicating whether she has a degree.  Velasquez, however, does not offer evidence demonstrating the similarities in their backgrounds, work experience, or responsibilities.  Moreover, other than testifying that he was an "equipment tech" -- the same position held by Velasquez -- she does not offer any other evidence to support her claim that their jobs were comparable.  Block v. Kwal-Howells, Inc., 92 Fed. Appx. at 660 (citing Doan v. Seagate Tech., Inc., 82 F.3d 974, 979 (10th Cir. 1996).[40]  Velasquez also does not provide evidence that Godac worked under the same supervisor.  The Court concludes that Velasquez has not offered sufficient evidence to establish a genuine issue of material fact that "similarly situated employees were treated differently."  Mitchell v. City and County of Denver, 112 Fed. Appx. at 670.

Assuming, however, that Velasquez' evidence meets her burden of establishing a genuine

---

[40] The Court also notes that Velasquez only testified that Godac was paid more than she, but, after admitting she had never seen his paycheck, she did not know what he was paid per hour.  Velasquez testified that Godac told her he was making "[a]bout a hundred dollars more than me [sic]," Velasquez Depo. at 123:1-2,  but she does not clarify whether that amount was per hour, day, month or year.

issue of material fact, the burden then shifts to Frontier to offer a legitimate, nondiscriminatory reason for the disparate pay.  Frontier concedes that Godac receives more pay than Velasquez, but explains that the difference in treatment was because Godac had worked at Frontier for a longer period of time than Velasquez.

Having offered a legitimate, nondiscriminatory reason, the burden shifts to Velasquez to present evidence that establishes that this reason is pretext.  Velasquez concedes the Godac had worked for Frontier for a longer period of time.  The only evidence that Velasquez offers is her allegation at her deposition that Godac has less job duties than she did.  To show pretext, however, Velasquez must offer evidence to demonstrate that Frontier's reason is unworthy of belief.  By merely stating at her deposition that the two had different job duties does not reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d at 1323 (quotation omitted).  Thus, Velasquez has not offered sufficient evidence to show that Frontier's legitimate, nondiscriminatory reason is pretext and, therefore, Frontier is entitled to summary judgment on Velasquez' discrimination claim to the extent that it relies on disparate treatment on the basis of pay.

### B.      UNLAWFUL DISCHARGE.

Although it is not clear from Velasquez' complaint or briefing whether she is alleging discriminatory discharge on the basis of race and/or gender, even if alleged, Velasquez does not offer sufficient evidence to support a finding of discrimination based on indirect evidence under the McDonnell Douglas analysis.

-49-

To establish a prima facie case of a discriminatory discharge claim, Velasquez must present evidence establishing that: (i) she is a member of a protected class; (ii) she was qualified for the job; (iii) even though qualified, she was discharged; and (iv) the job was not eliminated after her discharge. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1229.  Velasquez meets her burden of establishing a prima facie case because she is a women, she was qualified for her position, she was terminated on January 14, 2003, and her job was not eliminated after her discharge.[41]

Having met her prima facie case, the burden shifts to Frontier to offer a legitimate, nondiscriminatory reason for her discharge.  Frontier offered evidence that Holt fired Velasquez because she talked to him in a "hateful, rude and insubordinate manner."  Holt Aff. ¶ 24, at 7. Frontier also offered the Notice of Disciplinary Action, which states that Velasquez was terminated because of a negative attitude toward supervisors and other employees.  See Notice of Disciplinary Action at 1 (January 14, 2003).  In the discharge notice, Holt explained that she exhibited a negative attitude in their conversation, and that Holt and Sambrano had repeatedly warned her about that attitude.  To support its contention, Frontier also offers four additional Notice of Disciplinary Action forms, dated September 6, 2002, October 4, 2002, October 21, 2002, and December 24, 2002.  The September 6, 2002 form indicates Velasquez was orally reprimanded for tardiness, negative attitude, and late/incomplete work, and use of her work cellular phone to make personal calls.  The October 4, 2002 notice states that she was orally reprimanded for her negative attitude.  The October 21, 2002 notice states: "REPRIMAND AND WARNING THAT ADDITIONAL INFRACTION WILL LEAD TO FURTHER DISCIPLINARY ACTION WHICH MAY INCLUDE SUSPENSION OR

---

[41] In his affidavit, Holt states that Susan Dominguez replaced Velasquez' position after her termination.

-50-

DISCHARGE." Notice of Disciplinary Action at 1 (October 21, 2002). This notice also states that the reason for the disciplinary action was a negative attitude. See id. On the bottom of the form, Sambrano wrote: "Negative attitude towards new Respiratory Therapist that was hired to help Corine with workload. I advised Corine that she would be fired if her attitude toward coworkers did not improve." Id. See Velasquez Depo. at 212:13-18; id. at 215:21-24. Lastly, the Notice of Disciplinary Action dated December 24, 2002 states that she received an oral reprimand as well as a written reprimand for unsatisfactory work performance and negative attitude. Based on these disciplinary forms and Holt's affidavit, Frontier has offered a legitimate, nondiscriminatory reason for terminating Velasquez.

Under the McDonnell Douglas framework, Velasquez must offer evidence showing that Frontier's proffered reason for her termination is pretext. Although Velasquez concedes that she was "written up" by Sambrano for being "rude," Velasquez contends that Sambrano never sought her side of the story. Velasquez also alleges that Sambrano forced her to sign that reprimand. Velasquez testified that she never saw or received a copy of the reprimands attached to Frontier's motion for summary judgment.[42] Furthermore, Velasquez testified that she did not receive any of the oral reprimands on which the notices in the record were based.

A common way for a plaintiff to demonstrate pretext is "with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230. Velasquez

---

[42] None of the reprimands attached to Frontier's motion contain Velasquez' signature. The September 6, October 6, December 24, and January 14 notices contain the signature page, but none indicate Velasquez signed. The October 21 notice, however, does not contain a signature page, and Velasquez' signature does not appear on the part of the notice provided.

contends that Frontier did not follow its policies by not "receiv[ing] any oral reprimands as provided

for in the policy."  Response at 14.  The two different policy statements, the "Personnel Disciplinary

Action" form and the "Disciplinary Actions" form, describe two different procedures.  The

"Disciplinary Actions" form requires that verbal warnings be documented in writing and become part

of the employee's personnel file, along with any written reprimands.  Disciplinary Actions at V-19.

This policy statement, however, does not require that the employee receive notice, and does not state

that either a written reprimand or an oral reprimand documented in writing be signed.  See id.  The

other "policy" provided by Velasquez, however, outlines a different procedure.  Personnel

Disciplinary Action at 79.  The first disciplinary offense is usually an oral reprimand, which is written

up on the disciplinary action form, but a copy of the form is not give to the employee.  See id.  The

second offense, however, "must be signed by the employee.  A copy of this report is given to the

employee for his record."  Id.

        Based on the record, therefore, it is not clear what the company policy was for issuing notices

of disciplinary action.  Even assuming the written company policy was to have employees sign all

written notices after the first offense and provide a copy to the employee,[43] Frontier's failure to follow

this policy is insufficient to establish pretext.  The Tenth Circuit recently addressed a similar argument

in Doke v. PPG Industries, 118 Fed. Appx. 366 (10th Cir. Nov. 24, 2004)(unpublished decision).

In Doke v. PPG Industries, the plaintiff argued that his employer's "violat[ion of] its three-step

_____

        [43] The Court notes that, if the procedure outlined in the "Disciplinary Actions" form was the
company policy, Frontier complied with its procedures.  The "Disciplinary Actions" form does not
require the employee to sign either documented verbal warnings or written warnings, and does not
state that the employee receives a copy of the reprimands.  Disciplinary Actions at V-19.  The form,
however, provides that, for a reduction in pay or suspension, the supervisor must supply the employee
with a written documentation stating the reasons for the action.  The form does not indicate that this
procedure applies to terminations.

disciplinary policy by failing to give him a written warning before terminating his employment" demonstrated pretext for his claim of unlawful retaliation in violation of the Age Discrimination in Employment act ("ADEA").  Id. at *4.  After noting that there was conflicting evidence whether the employee actually received a written warning, and that the handbook expressly stated that the procedures were discretion, the Tenth Circuit concluded:

> Although this evidence raises doubts about whether [the employer] failed to follow the three-step disciplinary policy and whether the policy was even applicable, we must resolve these doubts in [the plaintiff's] favor on summary judgment.  Even when we do, however, this evidence is insufficient to support an inference of pretext.  The absence of a written warning is the only evidence of pretext [the plaintiff] has offered. No reasonable jury could conclude, solely on this basis, that [the employer's] asserted reason for the firing was "unworthy of belief."  Danville [v. Reg'l Lab Corp.], 292 F.3d [1246,] 1250 [(10th Cir.2002)]; see also Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir.1997) ("The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'"). Summary judgment was therefore appropriate.

Doke v. PPG Indus., 118 Fed. Appx. at *4.

As in Doke v. PPG Industries, in this case there is conflicting evidence whether Velasquez received the oral reprimands that are represented by the written documentation in the record. According to Velasquez, she was never orally reprimanded, and only saw one written reprimand, which she signed.  Moreover, none of the reprimands in the record reflect Velasquez' signature.  And unlike Doke v. PPG Industries, the policy statements do not indicate that the procedures are discretionary.  To the contrary, the policy statements use terminology indicating such procedures were mandatory.  See Personnel Disciplinary Action at 79 ("the first offense must be signed")(emphasis added).  According to Holt, however, Frontier does not have "a policy that reprimands, written or oral, will be given to employees prior to termination and whether or not to do so is discretionary not mandatory."  Holt Aff. ¶ 12, at 4.

Resolving all doubts in favor of Velasquez, and concluding that the mandatory policy was to have the employee sign all reprimands after the offense and provide the employee a copy of the reprimand, there is still insufficient evidence to create a genuine issue of material fact that Frontier's reason is pretext.  See Doke v. PPG Indus., 118 Fed. Appx. at *4.

In her written response to the motion, Velasquez alleges, without any citation to competent or sworn evidence in support of her allegation, that Frontier fabricated the notices in preparation for legal proceedings.  See Response at 15.  To determine whether there was any evidence in the record to support this allegation, the Court studied her deposition.  Frontier inquired about this allegation at Velasquez' deposition and, at one point, Velasquez stated that she was not aware of the allegation.  See Velasquez Depo. at 223:10 - 224:5; id. at 224:4-5 ("Q.  Was that an allegation you made or - - A.  I have never heard that allegation.").  It is not clear, however, based on the context of this statement, to which statement Velasquez was referring -- the allegation of fabrication or the allegations contained in the notices.  Nevertheless, Velasquez has offered no evidence, at her deposition or otherwise, that these notices were fabricated in preparation for this litigation.  This unsupported accusation in her brief is thus insufficient to create a genuine issue of material fact on pretext.  Frontier is therefore entitled to summary judgment on Velasquez gender and race discrimination claims.

## IV.    THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS.

Having dismissed all claims on which the Court had original federal jurisdiction, the Court, pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the state law claims.  See Pruitt v. Comcast Cable Holdings, LLC, 100 Fed. Appx. 713, 717 (10th Cir. June 3,

2004)(unpublished decision)(holding that the district court's refusal to exercise supplemental jurisdiction over plaintiff's state law contract claims after dismissing all federal claims was "clearly authorized under 28 U.S.C. § 1367(c)(3)").  Under 28 U.S.C. § 1367(a),  "in any civil action of which the district courts have original jurisdiction, [a] district court[] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  A district court, however, "may decline to exercise supplemental jurisdiction . . . if[:]"

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The third provision applies to this case.  The Court has dismissed all claims on which it had original jurisdiction -- the racial and sexual harassment claim and the gender discrimination claim.  The remaining claims -- breach of contract and wrongful discharge -- sound in state law.

The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.  In United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966), decided more than twenty years before Congress passed 28 U.S.C. § 1367, the Supreme Court addressed the federal district courts' ability to exercise jurisdiction over state law claims.  In explaining that such power existed, the Supreme Court noted that it "need not be exercised in every case in which it is

found to exist." Id. at 726.  The Supreme Court continued:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

Id. (footnotes omitted).  See Bd. of County Comm'rs of Sweetwater County v. Geringer, 297 F.3d 1108, 1115 n.6 (10th Cir. 2002)("[T]he district court's ruling [in which it declined to review the state law claims] comports with our general admonishment that district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial . . . .").

By dismissing the state law claims without prejudice, Velasquez will not be prejudiced, because under 28 U.S.C. § 1367(d), she has 30 days in which to re-file her state law claims in state court.[44]  As the Supreme Court explained: "To prevent the limitations period on such supplemental claims from expiring while the plaintiff was fruitlessly pursuing them in federal court, § 1367(d) provides a tolling rule that must be applied by state courts."  Jinks v. Richland County, South Carolina, 538 U.S. 456, 459 (2003).

**IT IS SO ORDERED** that the Defendants' Motion for Summary Judgment is granted in part and dismissed in part.  The federal claims, harassment on the basis of sex and race, and gender and race discrimination, are dismissed **WITH PREJUDICE**.  The remaining state law claims are dismissed **WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).

---

[44] 28 U.S.C. § 1367(d) provides: "The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Gilbert J. Vigil
Christina A. Vigil
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Calvin Hyer, Jr.
Michael H. Holt
Spann, Hyer, Hollowwa & Artley
Albuquerque, New Mexico

    *Attorneys for the Defendants*